JEROME H. MOONEY (SBN 199542)
WESTON, GARROU & MOONEY
12121 Wilshire Blvd., Ste 900
Los Angeles, CA 90025
Tel: (310) 442-0072
Fax: (310) 442-0899
Jerrym@mooneylaw.com
Attorney for Gerald Green

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No.:   CR 08-59-GW; 07-2090 M |
| Plaintiff, | : | |
| vs. | : | REPLY MEMORANDUM TO GOVERNMENT'S SENTENCING MEMORANDUM |
| GERALD GREEN and PATRICIA GREEN | : | |
| Defendants. | : | |

Defendant Gerald Green, through his counsel of record, Jerome H. Mooney, hereby submits his reply to the Government's Combined Sentencing Position for Defendants Gerald Green and Patricia Green and Response to Defendants' Joint Sentencing Memorandum of Points and Authorities.

This Reply addresses medical issues relating to Mr. Green and the significant impact on his health and survival posed by a sentence of incarceration.

1

Defendant respectfully requests the opportunity to supplement his position as to sentencing as necessary.

DATED: January 19, 2010                           Respectfully submitted,

                                                             JEROME H. MOONEY
                                                             WESTON, GARROU & MOONEY

                                                             /s/ Jerome H. Mooney

                                                             JEROME H. MOONEY
                                                            Attorneys for Gerald Green

MEMORANDUM OF POINTS AND AUTHORITIES

As set forth in Defendants Joint Sentence Memorandum, Mr. Green is in extremely poor health. While he wishes that his disease was "stable" as described by Mr. Deveza, the physician's assistant who works as the Health Services Administrator for the Metropolitan Detention Center in Los Angeles, California and who submitted a declaration on behalf of the government attesting to the level of care that Mr. Green can expect to receive under the BOP, Mr. Green's disease is progressive and irreversible. He can present as stable but without warning experience immediate need for life saving care. In the last 12 months he has had to be taken to hospital 5 times. He requires constant attention. As discussed in Defendants prior memorandum he is in constant need of oxygen, even when sleeping. He has an alarm on his oxygen to alert and hopefully wake him when it frequently slips off. In reality he is rarely awakened and it falls to his wife Patricia to respond to the alarm.

Even though Mr. Deveza admits that he was only in possession of limited information relating to Gerald Green, it is assumed that he was provided at least that portion of the Defendants' sentencing memorandum that described Mr. Greens health challenges. Not only does Mr. Green suffer from extremely severe emphysema, his condition is progressive. He has already lost so much lung function that he has none left to spare. At his current capacity every breath is a struggle. At the core of the issue is that ANY lung function lost due to any delay or interruption in his regime of treatment is <u>permanent</u>. This was clearly illustrated during the early period of this case when Mr. Green could not utilize steam therapy because of the monitoring device. During that period of time there was a decrease in lung function.

Defendant does not question that the Bureau of Prisons (BOP), subject to the constraints under which it operates, will strive to provide care. But there is an inherent tension imbedded in

3

the primary mission of the BOP to maintain security of prisoners and its obligation to provide for the needs of inmates in a human fashion.  Mr. Green is an elderly man who is dying from a pernicious disease.  The only question left in his life is how quickly will the disease win?  Anything and everything that contributes to the progression of the disease, including stress, is a battlefield loss to Mr. Green in this war of attrition that he must in the end lose.

The BOP has faced substantial challenges in providing health care to inmates.  A GAO report in 1994 found that care was deficient largely due to lack of staff.[1]  Between 1997 and 2009 the federal prison population has almost doubled.  From approximately 110,000 to just over 206,000 while overall BOP staffing has only grown from about 22,000 to about 27,000.  Thus, the staff to inmate ration according to DOJ figures has changed from 3.57 in 1999 to 4.97 in 2009.[2]  In addition, the inmate population of the BOP is aging creating greater cost and complications for already over taxed health care system.[3]  The BOP has dealt with this challenge through a number of cost saving approaches.  One is the reduction of staff and availability of service in Federal Prisons.  *Id at* 9 (Staff Related Initiatives).

And the future does not bring great promise.  As state in the FY 2010 budget for the BOP:

> "There are two primary factors contributing to increase in health
> care costs: 1) the increasing inmate population; and 2) inflation in
> the medical services industry and pharmaceutical costs. As a result,

---

[1] Report to the Chairman, Subcommittee on Intellectual Property and Judicial Administration, Bureau of Prisons Health Care, Inmates' access to Health Care Is Limited by Lack of Clinical Staff.  United States General Accounting Office, February 1994. (Exhibit A)

[2] United States Department of Justice, FY2010 Congressional Budget for the BOP at 1-5. (Exhibit B) This is for ALL staff, not just medical. While the budget calls for the addition of 880 personnel not one is in the medical area.  *Id. at* 13.

[3] United States Government Accounting Office, Federal Prisons – Containing Health Care Costs for and Increasing Inmate Population, April 6, 2000 at 6.  (Exhibit C)

4

> base program funding for health care is dangerously inadequate in maintaining at least the current level of services. Potential risks include delay in care, increased negative outcomes, and increase in legal liability due to the failure to provide care."

United States Department of Justice, FY2010 Congressional Budget for the BOP at 35.

This also involved a shift of services to "Lower-salaried medical personnel". *Id.* As recognized by the BOP itself, there is a tension in its mission. The purpose and scope of its medical program is "[t]o deliver medically necessary health care to inmates effectively in accordance with proven standards of care without compromising public safety concerns inherent to the Bureau's overall mission." BOP Program Statement 6010.02 at 1. (Exhibit D) The statement goes on to note that "[p]roviding health care within a correctional environment presents unique challenges not encountered by practitioners elsewhere." *Id.* at 3. And, further, noting the need for "Public Safety. Health care for inmates must be delivered within the constraints of correctional concerns and responsibilities inherent to the Bureau o f Prison's overall mission." *Id.* And, of course always remembering that "[m]edical services provided to Federal inmates will be obtained at the lowest possible cost." *Id.* at 4.

The government has claimed, and submitted a declaration of a Mr. Deveza, that the BOP can care for an inmate with emphysema, and that they already have inmates suffering from that disease in custody. This disease covers a broad range of conditions associated with a chronic loss of lung function. Because this disease is progressive, because this disease will eventually lead to death, because no patient suffering from emphysema will improve and ALL will slowly decline, the patient's life is measured only by the rate of decline. Short of a lung transplant it does not respond well to surgical treatment and thus the ability to prolong life and slow the progression of the disease is dependent upon a strict treatment routine. The BOP declaration does not advise how aggressive BOP treatment of this disease will be. It appears from the mere fact

5

that the declaration assumes Mr. Green to be "stable" that it points to acceptance of the progression of the disease. It is evident that Mr. Green's condition will worsen with stress, change, delay or absence of treatment. Defense counsel are informed that the BOP will not provide for steam treatments for Mr. Green and will not guarantee certain medications, certain particular treatment or even commit to where it would designate him to serve a custodial sentence.[4] Even the requirement to make major changes in his medication is likely to invite degradation in his condition. Much of the medication prescribed to Mr. Green is not available to the BOP and would have to be replaced with substitutes. (See Declaration of Carlos Deveza submitted by the government.) Just going through the transfer to alternative medication is risky. Dr. Reiss, Mr. Green's physician, for example, has advised that Azmacort or some other steroid

---

[4] It is defense counsel's experience that the BOP/government will not commit to any of the following all of which would be applicable to his condition/treatment: 1) where he would be designated; 2) or if he were designated to an FMC, if he would be in a dorm or hospital bed; 3) if there is any physician at the designate FMC who has any experience with late stage emphysema (or as advanced and complex a case as Mr. Green has); 4) how often he would see any physician; 5) how often he would see any medical personnel; 6) if he would in fact be on the schedule to be seen regularly at the designee FMC clinic staffed by an actual doctor; 7) whether he would get any or all of the medications which are now part of his treatment regimen; 8) how often his heart or lungs would be tested for relevant indicators of exacerbation of the disease or disease related problems; 9) whether the lab results would be provided to Mr. Green; 10) whether the lab results would be reviewed by a physician knowledgeable about his disease and his history; 11) what the schedule of his medications would be; 12) whether his medicines would be given on the present schedule without interruption; 13) whether any qualified physician would review his medicines and labs regularly and determine any shift necessary in schedule or amount or medicines; 14) if a BOP or BOP contracted physician recommended a medicine outside the BOP National formulary (such as some of the medicines he takes) would the request be granted; 16) whether he would be taken to a doctor or hospital associated with the FMC if he complained of serious symptoms, for example heart pain or severe breathing problems ; 17) what proactive treatment he would get to slow the progression of the disease, for instance now he uses steam saunas 3-4 times a week; 18) whether any BOP doctor he has contact with would consult a physician experienced with his advanced stage of emphysema; 19) whether his complete medical records would be reviewed by the staff physician at the designee FMC; 20) whether the staff physician would in fact ever consult with his team of physicians about his condition; 21) whether if he needed outside treatment would be delay in transporting him to such treatment; or, 22) whether a person in the ER at such outside facility would be knowledgeable about his condition and history or familiar with or have access to his medical records.

inhaler would address only a portion of the needs addressed by his proscribing Advair.  Mr. Green clearly needs ongoing medical treatment, proactive, not reactive.

Numerous courts have recognized that a non-custodial sentence is appropriate in cases incarceration would, by virtue of illness and disease, subject the individual to a high probability that his life would be shorted, that he would be at risk of death, or of significant and lasting permanent disability.  *United States v. Martin*, 363 F.3d 25 (1st Cir. 2004) (in tax fraud case, three level downward departure proper (and possibly more on remand) where "several serious medical conditions, including Crohn's disease, make Martin's health exceptionally fragile [and] . . . we are not convinced that the BOP can adequately provide for Martin's medical needs during an extended prison term [and] there is a high probability that lengthy incarceration will shorten Martin's life span); *United States v. Seiber*, 2005 WL 1801614 (E.D. Tenn., 2005) (court imposed probation in post-Booker sentencing in case involving advisory guidelines of 97-121 months for 69 year old convicted of sale of oxycontin because of defendant's extremely poor health);  *United States v. Gee*, 226 F.3d 885 (7th Cir. 2000) (downward departure under §5H1.4 based on health not abuse of discretion where judge reviewed 500 pages of medical records and concluded that "imprisonment posed a substantial risk to [defendant's] life," and where judge concluded that BOP letter stating that it could take care of any medical problem  "was merely a form letter trumpeting [BOP] capability"); *United States v. Willis*, 322 F. Supp. 2d 76, (D. Mass. 2004) (in tax evasion case downward departure granted to 69 year old from 27 months to probation with six months home confinement based upon inordinate number of potentially serious medical conditions, and was at age where such conditions would have invariably gotten worse in prison.  In response to government's argument that BOP could care for defendant, the court said "I have never had a case before me in which the Bureau of Prisons suggested that it

did not have the capacity to care for a defendant" *Id. at* 84; *United States v. Jiminez*, 212 F.Supp. 2d 214 (S.D.N.Y. 2002)(in illegal reentry case downward departure from range of 57-71 appropriate because after crime was committed defendant suffered brain aneurism, severe memory loss, and psychotic symptoms, and court rejected position of government that departure warranted only if a physical ailment cannot be adequately treated by BOP); *United States v. Lacy,* 99 F.Supp. 2d 108 (D.Mass. 2000) (three-level downward departure warranted in drug case where defendant suffers loss of hearing in left ear from bullet in his brain, has blood clots in his arteries, and experiences seizures); *United States v. Moy*, 1995 WL 311441 (N.D.Ill. May 18, 1995) (departure based upon defendant's advanced age, aggravated health condition, and emotionally depressed state); *United States v. Roth*, 1995 WL 35676 (S.D.N.Y. Jan. 30, 1995) (63-year-old defendant with neuromuscular disease had "profound physical impairment" warranting departure under the Guidelines); *United States v. Velasquez*, 762 F.Supp 39, 40 (E.D.N.Y. 1991) (life-threatening cancer warranted downward departure); *United States v. Patriarca,* 912 F.Supp. 596, 629 (D.Mass. 1995) (life-threatening disease warrants downward departure). In *United States v. Jones*, 352 F.Supp. 2d 22 (D. Me. 2005) the district court judge in a firearms' possession case sentenced the defendant below the guidelines, finding that not returning defendant to prison would better insure continuing medical care or other correctional treatment in the most effective manner for this defendant who had a mental illness.

     Likewise, non-custodial type sentences have been found to be appropriate in cases where a necessary medical treatment program for a serious medical condition would be negatively impacted by incarceration. *United States v. Greenwood*, 928 F.2d 645 (4th Cir. 1991) (where defendant was felon who possessed firearm, departure to probation proper where defendant had severe medical impairment caused by loss of both his legs below his knee due to action in the

Korean where defendant required treatment at Veterans Administration Hospital and that incarceration would jeopardize ongoing necessary treatment); *United States v. Ribot*, 97 F.Supp. 2d 74 (D.Mass.1999) (downward departure of seven levels justified to preserve treatment plan); *United States v. Baron*, 914 F.Supp. 660 (D.Mass. 1995) (in bankruptcy fraud, departure from range of 27-33 months to probation and home detention for a 76-year old defendant with medical problems which could be made worse by incarceration).

     Mr. Green's medical condition is aggravated by his age. Even pre-Booker age was an appropriate reason to impose a sentence below the applicable guideline range "when the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration); *United States v. Hildebrand*, 152 F.3d 756 (8th Cir. 1998) (affirmed downward departure for 70-year old from range of 51-63 months to probation with 6 months in home confinement where defendant was a bookkeeper for a group convicted of mail fraud and had life-threatening health conditions – even though court of appeals said it would not have granted a departure). See also United States Sentencing Commission Report released in May, 2004) (located at http://www.ussc.gov/publicat/Recidivism-General.pdf.) (stating "The likelihood of recidivism by a 65 year old is very low." ) See also Correctional Health Care, Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates, U.S. Department of Justice, National Institute of Corrections, 2004 edition, pp 9 and 10. (management problems with elderly inmates [defined as over 50 years old], ... are intensified in the prison setting and include: vulnerability to abuse and predation, difficulty in establishing social relationships with younger inmates, need for special physical accommodations in a relatively inflexible physical environment.)

The BOP has five medical facilities (FMC's). There are no minimum security level FMC's. While Mr. Green would if sentenced otherwise qualify for a camp setting, because of his medical needs, he will be precluded from that and will serve any sentence in a more restrictive setting that a comparable inmate without his illness. This includes restricted movement within the facility, strip searches before and after each visit, co-mingling with inmates with significantly more sophisticated and violent criminal histories, more restrictive control on mail and telephone, etc.

Stress has a negative and progressive effect on patients suffering from emphysema. Common stressors in prison, particularly secure facilities include regimentation, sleep disturbance, food, separation, etc. Defense counsel have learned from a BOP expert and from historical knowledge from hundreds of sentenced clients, that access to health care is limited in every BOP facility. Non-emergency medical issues are typically dealt with the following day at sick call. There are no 24-hour pharmacies available for over the counter medications after hours. If an inmate becomes ill during off hours and it is determined to be nonemergency, he may not have access to a health care provider until the next day or even several days later.[5] For inmates with chronic or serious ongoing medical issues, this distance between them and direct access to their health care provider alone is stressful. Further, inmates don't control their health care in a correctional facility. They can't arrange on their own for a second opinion or a consultation with a particular medical specialist. Those decisions are made by institution staff. What is or is not an emergency requiring immediate attention is a decision making process that passes through several levels of authority.

---

[5] See D. Murphy, *Health Care in the Federal Bureau of Prisons: Fact or Fiction*, California Journal of Health Promotion 2005, Vol 3, Issue 2, 23-37 (Exhibit E)

## CONCLUSION

Chief among the purposes of incarceration is the need to incapacitate those who pose a risk to society. Mr. Green is clearly not such an individual. This is not a case where Mr. Green's life can be weighed against the danger he poses to others. The remaining purposes of sentencing are punishment and deterrence. Punishment should not include as a component the shortening of what time Mr. Green has left to live. While there is deterrence in deprivation of freedom such result should not be gained at the significant risk to Mr. Green's health and his very survival posed by the disruption to his treatment necessarily attached to a custodial sentence.

DATED: January 19, 2010                     Respectfully submitted,

                                             JEROME H. MOONEY
                                             WESTON, GARROU & MOONEY

                                             /s/ Jerome H. Mooney
                                             JEROME H. MOONEY
                                             Attorneys for Gerald Green